UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Pamela J. Duray,

       Plaintiff,

v.

                                 **MEMORANDUM OPINION
AND ORDER**
Civil No. 12-2800 (MJD/FLN)

Jeh Charles Johnson, Secretary, U.S.
Department of Homeland Security,

       Defendant.

_____

       Richard T. Wylie, Counsel for Plaintiff.

       Friedrich A. P. Siekert and Bahram Samie, Assistant United States
Attorneys, Counsel for Defendant.

_____

       This matter is before the Court on Defendant's motion for summary

judgment.

## I.      Introduction

       Plaintiff is a 58 year old female who suffers from a number of medical

conditions, including chronic ear disease, idiopathic uticaria, severe depressive

disorder, anxiety and neurological pain syndrome.  In addition, in September

2010, Plaintiff fractured her foot.  (Id. Ex. D, ¶ 6.)

Beginning in 2003, Plaintiff was employed as a Human Resources Assistant ("HRA") by the Defendant U.S. Department of Homeland Security, in the Minneapolis Hiring Center ("MHC") of Customs and Border Protection (Defendant will hereinafter be referred to as "CBP").  (Comp. ¶ 3(A).)  She was awarded disability retirement in January 2012.  (Samie Decl. Ex. A (Plaintiff Dep. at 167).)

In this action, Plaintiff claims that was discriminated against by CBP based on her sex, age and disability.  She further claims she suffered retaliation for engaging in protected conduct that involved filing a number of EEO complaints. The claims included in this action arise from an EEO complaint filed by Plaintiff on February 28, 2011, and are brought under the Rehabilitation Act, 29 U.S.C. § 791 et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and Title VII, 42 U.S.C. § 2000e et seq. (Comp. ¶ 4.)[1]

## II.   Employment History

Prior to her employment with CBP, Plaintiff served in the United States Air

---

[1]The Court notes that Plaintiff filed a *pro se* complaint in June 2015 against CBP in which she alleges claims under the Rehabilitation Act, Title VII and the ADEA that overlap the claims alleged in this action, and asserts new claims of hostile work environment and constructive discharge.  Duray v. Jeh Johnson, Secretary, U.S. Dep't of Homeland Sec., No. 15-cv-2813.  The Court will not address the new claims in this Memorandum Opinion and Order.

Force from 1980 to 1982 as a medical specialist.  In 1982, Plaintiff joined the

Army, where she served until 1990 in multichannel communications.  (Samie

Decl. Ex. A (Plaintiff Dep. at 25, 34-35).)  She then served in the Army Reserves

until 1998. (Id. at 30.)  After discharge from the Army, Plaintiff attended

community college.  (Id. at 42.)  In December 1996, she began employment with

the Immigration and Naturalization Service ("INS") as secretary to the Assistant

Director.  (Id. at 43-44.)  When the INS was reorganized to Immigration and

Customs Enforcement ("ICE") and became part of the Department of Homeland

Security in 2003, Plaintiff worked for both ICE and CBP, and then transitioned

fully into CBP as an HRA.  (Id. at 45-46.)

As an HRA at CBP, Plaintiff provided staffing services for entry-level front

line positions with the Office of Field Operations, Office of Border Patrol and

Office of Air and Marine Operations.  (Olson Decl. ¶ 3.)  An HRA is also

responsible for responding to applicant inquiries, administrative tasks, assisting

with qualifications reviews and job announcements.  (King Decl. ¶ 5.)

In July 2009, Plaintiff was reassigned to the Field Office Hiring Unit

("FOH") where she remained until her retirement.  (Melcher Decl. ¶ 4.)  Plaintiff

was reassigned due to a restructuring of the MHC.  (Id.)  After the reassignment,

Plaintiff began the FOH's structured training plan.  (Rohleder Decl. ¶ 7; Adrian

Decl. ¶ 5.)  Under this plan, new HRAs are trained on a job task, and each trainee

is subjected to full review by their trainers.  (Id.)  Once a trainee demonstrates

proficiency in the performance of the task for which she received training, she is

permitted to work on assignments related to that topic and would move to a new

task for training.  (Adrian Decl. ¶ 5.)  Once fully trained, the HRA would be

added to the "quilt"; a work assignment schedule designed to ensure that all

employees receive the same opportunities and responsibilities in the FOH.  (Id.)

Plaintiff did not complete the training until April 2010.  (Id. at ¶¶ 5-6.)

        Plaintiff's supervisor upon her transfer to FOH was Janet Adrian.  It was

Adrian's opinion that Plaintiff's overall job performance was poor.  (Id. ¶ 6.)  In

an October 2009 Employee Proficiency Review, six core competency areas were

listed: job knowledge; technical skills; professionalism; working with others;

ability to classify, create and handle classified information; and customer service.

(Id., Ex. A.)  During Plaintiff's mid-year review in April 2010, Adrian addressed

the above competency areas and noted that trainers had to repeat instructions

several times for Plaintiff, and that they had to re-direct or re-focus her frequently

to keep her on task.  (Id. Ex. A at 2).)  Plaintiff also was told to follow standard

4

operating procedures, rather than suggest new ways while in training, and that she needed to work faster while still maintaining accuracy.  (Id.)

Adrian met with Plaintiff in March 2010, at which time Plaintiff complained that she suffered from pain on a daily basis.  (Id. ¶ 7.)  Adrian mentioned that Plaintiff may wish to consider disability retirement, based on Plaintiff's comments that sitting and working all day exacerbated her pain.  (Id.) Plaintiff thanked Adrian for "her thoughtful and kind understanding regarding this and the difficulties I must already endure" but stated that she wanted to continue to work and serve her country.  (Adrian Decl. Ex. C.)

When Adrian was transferred to a different unit in May 2010, Stacy King became Plaintiff's supervisor.  (Adrian Decl. ¶ 4; King Decl. ¶ 6.)  In September 2010, Plaintiff asked King if she could work on specific tasks, some of which were not duties of the FOH.  (King Decl. ¶ 8.)  King asserts that she considered all of Plaintiff's requests and responded in accordance with her work performance, her duties as HRA and workload demands and needs of the MHC.  (Id.)  King's supervisor, Mary Melcher, participated in a meeting in September 2010 in which they discussed Plaintiff's requests.  (Id.)  King and Melcher did not consider Plaintiff's requests to be accommodations related to her disability, because they

were not associated with her disabilities.  (Id.)

For example, Plaintiff requested to work on various programs and hiring authorities, such as vetting, category rating and Schedule A and student programs.  These requests were denied because they were either outside the scope of Plaintiff's position or were duties specific to the position of Human Resources Specialists ("HRS").  (Id. ¶ 8(b).)  In addition, Plaintiff requested the opportunity to work on USA Staffing and/or e-verify.  (Id. ¶ 8(c).)  To work on USA Staffing, however, one must be licensed, and such licenses were both limited and expensive.  (Id.)  Because there was no need for more staff to work on USA Staffing, and because it was outside Plaintiff's job duties, this request was also denied.  (Id.)

In September 2010, Plaintiff injured her foot.  King noticed that Plaintiff had difficulty navigating between the community printer and her cubicle, so she arranged for a printer to be placed in Plaintiff's cubicle.  (King Decl. ¶ 9.)  When it appeared that Plaintiff's foot injury had healed, and she did not have trouble moving around, King had the printer removed from Plaintiff's cubicle.  (Id.)

On October 14, 2010, Plaintiff applied for an internal promotion to an HRS position.  (Plaintiff Ex. WW.)  The HRS involved in the hiring for two HRS

6

positions was Wendy Rohleder.  (Rohleder Decl. ¶ 6).)  Rohleder interviewed the

candidates along with King and HRSs Paul McMahan and Pam Monten.  (Id.)  In

making their recommendation to the hiring authority as to who to hire, they

considered the candidates' work histories and the results of their written

examinations.  (Id.)  Ultimately, they recommended that someone other than

Plaintiff be hired for one of the open positions because that candidate's interview

was rated "excellent," her writing examination was rated "superior" and she had

proven project/time management, communication and writing skills.  (Id.)  With

respect to the other position, they recommended a candidate that had been rated

"satisfactory to excellent" in her interview and was rated "clearly effective" in

her writing examination.  (Id.)  Rohleder felt that both applicants were more

qualified than Plaintiff, who rated only "satisfactory" for her interview and

"partially effective" in her written examination.  (Id.)

King asserts that Plaintiff had an unsatisfactory job performance during the

time she supervised her, which was May 2010 to April 2011.  (King Decl. ¶ 11.)

She found that Plaintiff was unable to accurately interpret or apply federal laws

and regulations or follow standard operating procedures.  (Id.)  Plaintiff also had

trouble managing her workload and responding timely or accurately to customer

needs. (Id.)  As a result, her performance appraisal and within grade increase

("WGI"), scheduled to take place in October 2010, was delayed to offer her the

opportunity to improve her performance before receiving a rating of

unsatisfactory or fail.  (Id.)

In December 2010 and January 2011, Plaintiff requested reassignments

from the FOH unit to positions in the Medical Unit, Office of Border Patrol and

the Office of Air and Marine.  (King Decl. ¶ 10.)  King informed her supervisor of

Plaintiff's requests, who then contacted the units to which Plaintiff sought

reassignment.  Because there were no vacancies in those units at the time of

Plaintiff's requests, her requests were denied.  (Id., Ex. B; Melcher Decl. ¶ 12, Ex.

A.)  Plaintiff did not indicate that these reassignment requests were to

accommodate her disability.  (King Decl. ¶ 10; Melcher Decl. ¶ 12.)

Because of Plaintiff's performance issues, King drafted an employee

proficiency plan ("EPP"), and such plan was implemented on January 12, 2011.

(King Decl. Ex. C; Melcher Decl. ¶ 11.)  The EPP, which was to be in place for 90

days, outlined each of Plaintiff's work performance deficiencies and provided

ways in which to improve those deficiencies.  (Id. Ex. C.)  Prior to the

implementation of the EPP, Melcher and King met with Plaintiff to explain the

nature of an EPP and how it was intended to help Plaintiff improve her performance.  (Id.)

Later, in an email to King and Melcher, Plaintiff challenged the EPP, and noted that she felt singled out, scrutinized and monitored daily, and as a result, she was suffering from stress.  (Plaintiff Decl. Ex. TT.)  She further noted that she had requested "reassignment several times due to the stress this is causing me that negatively impacts my disabilities and me, and I sent emails informing you." (Id.)

In early March 2011, Plaintiff requested that she either be reassigned to another unit or that she be allowed to work only 32 hours per week due to her multiple medical difficulties.  (Duray Decl., Exs. II and JJ.)  In response, King replied that Plaintiff had to give such information to DCR.  (Id. Ex. KK.)  "As I have stated to you several times over the past few days, you need to contact them using the information I provided to you to get the ball rolling."  (Id.)

On March 21, 2011, King sent Plaintiff a memorandum outlining her progress under the EPP, and noted multiple issues.  (King Decl. Ex. D.)  For example, King noted a discrepancy in the number of emails, voicemails and phone calls reported by Plaintiff, and those reported by the HRSs.  (Id.)  King also

noted a dissatisfaction with the amount of time Plaintiff spent on her requests for

accommodation, rather than following the procedures provided for such

requests.  (Id.)  King further noted that Plaintiff continued to show a lack of

understanding of what applicants were asking, and that she asked the same

questions repeatedly.  (Id.)  Also, King noted that Plaintiff was observed

muttering to herself and having inappropriate phone calls with some applicants.

(Id.)

Shortly after the 90 day EPP period ended on April 12, 2011, Plaintiff went

on FMLA leave.  As a result, King did not have the opportunity to discuss with

Plaintiff the fact that she had failed her EPP.  (Id. ¶ 12.)  Plaintiff remained on

FMLA leave for twelve weeks.  (Rohleder Decl. ¶ 8.)  While on leave, Plaintiff

provided CBP a copy of a letter from her treating physician, Dr. Andrew Will,

dated June 13, 2011.  (Id., Ex. B.)  In this letter, Dr. Will noted that Plaintiff was

under a "no work" restriction, but that once her symptoms were under control,

he believed that she could return to work with accommodations.  (Id.)  The

accommodations he recommended included that she be allowed to leave for

health appointments, and that she work only 32 hours per week.  (Id.)  Dr. Will

further noted that Plaintiff's impairments have reduced her ability to focus and

concentrate, and that she has difficulty hearing which affects relationships with

others and often decreases communication quality.  He also noted she has

recurrent dizziness and that her impairments were permanent.  (Id.)

Dr. Will then noted that after reading her job description, he believed that

Plaintiff could not perform the following tasks:

> Adequately prioritize work.
> Adequately evaluate data such as placing applicants in rank order on an
> inventory.
> Adequately interview interns and employees.
> Adequately revise and administer questionnaires.
> Adequately make classification determinations on lower grade positions.
> Adequately review competitive levels for discrepancies and adequacy of
> justifications.
> Adequately evaluate adequacy of facts for processing cases involving
> employee benefits.
> Adequately informally resolve recurring HR issues for those applicable.
> Adequately prepare summary descriptions of approved awards for
> publication and outline reasons why certain awards were not approved.
> Adequately process a full range of actions including those that have
> unusual conditions.
> Adequately conduct interviews to identify and organize facts of a situation.
> Adequately identify and resolve procedural issues.
> Adequately discuss proposed deviations from policy and operating
> procedures, or controversial issues, with supervisor for direction.

(Id.)

Dr. Will concluded that "[a]s much of her current symptoms are derived

from perceived stress from poor relations with current supervisors and team

11

leaders, I would request that you consider having her reassigned to a different office to work." (Id.)

Plaintiff applied for disability retirement on July 10, 2011. (Samie Decl. Ex. E.)

Plaintiff returned to work on July 25, 2011. (Rohleder Decl. ¶ 8.) At that time, Plaintiff was asked to provide medical documentation as to what work she was medically cleared to perform, given the restrictions listed in the June 13, 2011 letter from Dr. Will. (Rohleder Decl. ¶ 8; Melcher Decl. ¶ 14.) The record contains no evidence that Plaintiff provided such information.

Dr. Will provided another letter on behalf of Plaintiff dated July 27, 2011. (Plaintiff Decl. Ex. QQ.) This letter was submitted in support of her application for disability retirement. (Id.) Dr. Will outlined her medical issues and concluded that Plaintiff was under a "no work" restriction "[d]ue to the high level of focus and critical thinking required for her job . . . " (Id.)

On July 28, 2011, MHC Director Gary Olson presented Plaintiff with a Notice of Proposed Removal based on the determination that she failed the EPP. (Olson Decl. ¶¶ 9-10; Ex. E.) The Notice further provided that a final decision would be issued no earlier than 30 calender days from receipt of the Notice. (Id.)

Plaintiff was offered 45 minutes of supervised time to collect her personal

belongings, but did not permit her access to her computer.  (Id. ¶ 12.)  At that

time, Plaintiff was placed on administrative leave without loss of pay.  (Id. Ex. F.)


On October 17, 2011, Olson responded to Plaintiff's outstanding

accommodation requests of reassignment and light duty work.  (Id. Ex. H.)

Olson noted that in August 2011, Plaintiff submitted a Work Ability Report

which provided that Plaintiff could not return to work until reevaluated in two

weeks.  (Id.)  Olson noted that no follow up report was ever provided.  (Id.)

Olson determined that based on the documentation available at that time,

Plaintiff was not able to work, therefore no accommodations would permit her to

return to work, and her request for accommodation was therefore denied.  (Id.)

Olson further noted that "[s]hould you be medically able to return to work

however, and require any of the accommodations previously requested or new

accommodations, please contact your servicing DCR Officer . . . for an evaluation

of your request(s)."  (Id.)

Ultimately, a final decision as to Plaintiff's proposed removal was never

made as Plaintiff's application for disability retirement was approved on January

20, 2012.

## III.    Discrimination Claims

In a February 2011 EEO complaint, Plaintiff claimed that she was

discriminated against on the basis of age, sex and disability.  (Samie Decl. Ex. C

(EEO complaint at 000034).)  She further claimed that she had previously filed

EEO complaints in May 2008 and May 2010[2] and an EEO Appeal in October 2010.

(Id.)[3]

In the February 2011 EEO complaint, Plaintiff reported numerous instances

beginning in 2006 in which she felt that her requests for accommodation were not

properly considered, that she was subjected to a hostile work environment and

suffered retaliation for engaging in protected activity.  (Id. at 00035-38.)  Plaintiff

thereafter submitted an amendment to her EEO complaint to include allegations

concerning her requests for reassignment, and the removal of the printer from

_____

[2]The May 2010 EEO complaint included claims of failure to accommodate based on
CBP's denying her a cordless earpiece for her telephone, non-selection for a HR Specialist
position, being provided lower level assignments and exclusion from staff meetings.  (Wylie
Decl. Ex. E.)  In response to this EEO complaint, CBP was ordered to provide Plaintiff a cordless
earpiece, but her remaining claims were found to be without merit.  (Id.)  No information was
provided the Court as to the earlier EEO complaint.

[3]There is no record that Plaintiff filed a civil suit relating to the administrative denial of
the prior EEO complaints.

her cubicle.  (Id. at 000040-43.)


During the investigation of Plaintiff's claims, Plaintiff again sought to

amend her complaint.  In response, CBP allowed some issues to be added to the

EEO complaint.  (Id. Ex. F.)  CBP outlined the modified claims as follows:

1.     Since July 2009, after her involuntary reassignment and placement
       on a training plan, she has been subjected to constant monitoring,
       criticism and unreasonable demands;

2.      in early 2009 and on March 26, 2010, management suggested she
       apply for disability retirement;

3.     on September 24, 2010, and January 10, 11 and 20, 2011, her requests
       for job enhancing work were denied;

4.     on December 8, 2010, she learned she was not selected for the
       position of Human Resources Specialist, GS-201-7/9, advertised
       under vacancy announcement IHC-389963-OCGMP;

5.     on December 10, 2010, Complainant's printer, which previously was
       provided in response to her request for accommodation, was
       removed;

6.     in December 2010 and January 2011, Complainant's requests for
       reassignment as a reasonable accommodation were denied;

7.     during a meeting on January 7, 2011, Complainant was informed
       that her annual appraisal and Within Grade Increase would be
       delayed due to the issuance of an Employee Proficiency Plan, her
       request to have her attorney present during this meeting was denied,

and, on January 12, 2011, she was placed on an Employee
Proficiency Plan;

8.      after returning to the office from Family Medical Leave Act (FMLA)
        leave, on July 26, 2011, she was questioned about her medical
        limitations and instructed to provide medical information from her
        physician describing what work she could perform (amended
        August 10, 2011);

9.      on July 28, 2011, she was placed on administrative leave pending a
        proposed removal action and denied access to her emails and EEO
        documents maintained in her office (amended August 10, 2011); and

10.     on or around September 24, 2011, she was notified that management
        denied her requests for reasonable accommodation for reassignment
        or part time work (amended September 28, 2011).

(Id.)

A Final Agency Decision was issued by the Department of Homeland

Security in August 2012.  (Id. Ex. C.)  With respect to each of her claims, the

Department found that Plaintiff failed to prove that CBP discriminated against

her.  (Id.)

Plaintiff timely filed this action on November 2, 2012.  In her Complaint,

Plaintiff asserts claims under the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 et

seq., the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S. §§

621 et seq., and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

2000e et seq.

## IV.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).  The party opposing summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## V.    Discussion

### A.    Failure to Exhaust Administrative Remedies

17

Exhaustion of administrative remedies is a prerequisite to bringing an

employment discrimination claim in federal court.  42 U.S.C. § 20003-16(c); <u>Bailey</u>

<u>v. U.S.P.S.,</u> 208 F.3d 652, 654 (8th Cir. 2000).  "Specifically, employees of federal

government agencies who believe that they have been discriminated against

'must consult a[n EEO] Counselor prior to filing a complaint in order to try to

informally resolve the matter.'" <u>Id.</u>  (citing 29 CFR § 1614.105(a)).  The employee

must make contact with the counselor within 45 days of the discriminatory act.

<u>Id.</u>

Relevant to the claims at issue in this case, Plaintiff made contact with an

EEO counselor on January 6, 2011.  (Samie Decl. Ex. C at 000033.)  Accordingly,

Plaintiff's claims based on conduct that occurred prior to November 22, 2010, 45

days before January 6, 2011, including claims that she was subjected to constant

monitoring, criticism and unreasonable demands after her involuntary transfer to

FOH in July 2009, management's suggestion she apply for disability retirement

and the denial of her request for job enhancing duties in September 2010, are time

barred.

**B.      Failure to Accommodate Claims**

Plaintiff alleges that CBP failed to reasonably accommodate her disabilities

18

in violation of the Rehabilitation Act.  She alleges that CBP failed to

accommodate her disabilities when her printer was removed from her cubicle,

and when her requests for reassignment and/or part-time work were denied.

Claims under the Rehabilitation Act are analyzed under the same legal

standards as those arising under the Americans with Disabilities Act ("ADA").

Adams v. Rice, 531 F.3d 936, 943 (D.C. Cir. 2008) (noting that Rehabilitation Act

instructs courts to use the same standard employed in cases arising under the

ADA).  To succeed on her claim of failure to accommodate, Plaintiff must first

make a facial showing that she is disabled as defined under the ADA, that she

suffered an adverse employment action and that she is a qualified individual.

Fenney v. Dakota, MN & Eastern R. Co., 327 F.3d 707, 712 (8th Cir. 2003).  "To be

a 'qualified individual' within the meaning of the ADA, an employee must '(1)

possess the requisite skill, education, experience, and training for h[is] position,

and (2) be able to perform the essential job functions, with or without reasonable

accommodation.'"  Id.  If a plaintiff cannot perform the essential functions of her

job without accommodation, she must show that a reasonable accommodation is

possible.  Fenney, 327 F.3d at 712.

Once this showing is made, the burden shifts to the employer to show that

it was unable to accommodate the employee.  Id.  Where an employee requests

an accommodation, the employer must, in good faith, engage in an interactive

process to determine whether a reasonable accommodation is possible.  Cravens

v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1021 (8th Cir. 2000).

A reasonable accommodation can include job restructuring, part-time or

modified work schedules, reassignment to a vacant position, an appropriate

adjustment or modification of examinations or training or other similar

accommodations. 42 U.S.C. § 12111(9)(B).  A reasonable accommodation does not

include an accommodation that would impose an undue hardship on the

employer's operation.  42 U.S.C. § 12112(b)(5)(A).

### 1.      Removal of Printer from Plaintiff's Cubicle

Plaintiff argues that her foot condition entitled her to a temporary

handicap parking permit that did not expire until March 31, 2011.  (Duray Decl.

Ex. Z.)  She further asserts that the fracture line in her foot was still visible on

May 25, 2011.  (Duray Decl. Ex. Y.)  Thus, she argues that at the time the printer

was moved away from her desk in December 2010, she was still in need of such

accommodation.

An adverse employment action is one that causes a material change in the

terms or conditions of employment, not one that involves minor changes in an

employee's working conditions.  Fenney, 373 F.3d at 716-17.  The Court finds that

Plaintiff has not made a facial showing that with respect to her foot injury, she

suffered an adverse employment action when the printer was moved away from

her desk.  Accordingly, the Court finds that CBP is entitled to summary judgment

on this claim.

### 2.     Requests for Reassignment and/or Part-Time

#### a.     Pre FMLA Leave

CBP argues it is entitled to summary judgment with regard to Plaintiff's

requests for reassignment and part-time work prior to her FMLA leave because

Plaintiff failed to initiate the interactive process as to those requests.  E.E.O.C. v.

Convergys Customer Mgmt. Group, Inc., 491 F.3d 790, 795 (8th Cir. 2005).  As a

result, CBP was not put CBP on notice that her requests for reassignment in late

2010 and early 2011 were actually requests for accommodation.  CBP has a

designated process for its employees to use when requesting an accommodation

and  Plaintiff has availed herself of this process in the past.  She did not do so,

however, with respect to the reassignment requests in late 2010 and early 2011.

As such, it was reasonable for her supervisor to conclude that Plaintiff was not

making an accommodation request.

Plaintiff concedes that her requests for reassignment initially were for career development, but that by January 2011, she had became so anxious, depressed and stressed by the pressure of training and monitoring, it was clear that her reassignment requests were made to relieve stress and could be reasonably construed as an accommodation request.

For example, in an email dated January 11, 2011, following the meeting to discuss the EPP,  Plaintiff wrote to her supervisors that she felt singled out, scrutinized and stressed, and that she had requested reassignment due to the stress that negatively impacts her disabilities.  (Plaintiff Decl. Ex. TT.)   Plaintiff argues this was sufficient to put CBP on notice that the reassignment requests were to accommodate her disabilities.  See Walters v. Mayo Clinic Health Sys., 998 F. Supp.2d 750, 764 (W.D. Wis. 2014) (finding that when an employee's disability is related to mental health, communication becomes more difficult and the employer should take some responsibility to take the small step and consider possible accommodations); see also 29 CFR § 1630.2 (o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered

entity to initiate an informal, interactive process with the individual with a

disability in need of the accommodation. This process should identify the precise

limitations resulting from the disability and potential reasonable

accommodations that could overcome those limitations.")

Plaintiff further argues that in March 2011, she submitted a request for

accommodation for part time hours or reassignment and supported the request

with a letter from her neurologist.  (Plaintiff Decl. Ex. II, Ex. JJ.)  Finally, Plaintiff

requested the accommodation of reassignment to a different unit due to disability

in May 2011 when she filed the official form for such accommodation through

her attorney.  (<u>Id.</u> Ex. LL.)

The Court agrees that fact questions exist as to whether the interactive

process was properly initiated.  Assuming Plaintiff did properly initiate the

interactive process, however, she must still demonstrate the existence of fact

questions as to whether there were reasonable accommodations available that

would have allowed her to perform the essential functions of her job.

Plaintiff has not met this burden.

Plaintiff asserts there appeared to be one or more positions open in

December 2010 and January 2011 to which she could have been reassigned.

(Wylie Decl. Ex. D.)  There is no evidence in the record, however, demonstrating that Plaintiff was qualified for these positions.  The open positions in December 2010 and January 2011 were for the position of Human Resources Specialist, which Plaintiff concedes are positions in a grade higher than her position as an HRA.

Plaintiff also cites to an unsworn declaration from Gwen Wild regarding a Mission Support Assistant position.  (Wylie Decl. Ex. M.)  In response to the questions of whether she offered a reassignment position to Plaintiff, Wild stated "No I did not offer a reassignment opportunity to Ms. Duray.  According to her request, she was interested in working in the Medical Unit.  I did not have an assistant vacancy in that unit.  When the Mission Support Assistant position vacancy on the Interviewing Team was announced in December, Ms. Duray did not apply." (Id.)  A review of the full declaration, however, demonstrates that Wild was not aware that Plaintiff's reassignment request was a request for accommodation, and that the Mission Support Assistant was posted.  (Id.)  There is also no evidence in the record to show that Plaintiff was qualified for this position.

**b.     Post FMLA Leave**

24

To the extent Plaintiff's failure to accommodate claim is based on events that took place after she returned from FMLA leave on July 25, 2011, such claim fails because Plaintiff has failed to show that she was otherwise qualified to perform the essential functions of the job at that time.

As set forth above, Plaintiff's physician provided a letter dated June 13, 2011 in which he opined that Plaintiff could not complete many of her job duties, such as prioritizing work, placing applicants in rank order on an inventory, interviewing interns and employees, revising and administering questionnaires, evaluate training needs for newly selected supervisors and identify and resolve procedural issues.  (Rohleder Decl., Ex. B.)  When she returned to work, Plaintiff provided a Work Ability Report which indicated she could return to work on light duty.  King and Melcher asked Plaintiff what tasks she was medically able to perform, based on the information in the June 13, 2011 letter from her physician.  The following day, Plaintiff's physician again placed Plaintiff on a "no work" restriction.

The next day Plaintiff was placed on administrative leave based on the determination she failed her EPP.  While on leave, Plaintiff submitted another Work Ability Report which indicated she could not return to work until she was

reevaluated.  There is no evidence in the record that CBP was ever provided

further information regarding Plaintiff's "no work" status.

Based on the record in this case, the Court finds that CBP is entitled to

summary judgment on Plaintiff's failure to accommodate claims as Plaintiff has

failed to demonstrate reasonable accommodations existed or that she was

qualified to perform the essential functions of her job with accommodation.

### C.      Disparate Treatment Claim/Failure to Promote

Plaintiff claims that she has established a prima facie case of intersectional

discrimination with respect to her failure to promote claim; that she has been

discriminated against as a disabled female over the age of forty.  (Plaintiff's

Memorandum in Opposition to S.J. at 53.)  She further claims that to dispute her

claim, CBP must demonstrate that another person who was a member of all of

the protected classes at issue - age, gender and disability - was selected for the

position Plaintiff sought.

Assuming Plaintiff has established a prima facie case of intersectional

discrimination based on gender, age and disability, to prevail on this claim

Plaintiff must demonstrate that there are genuine issues of fact as to whether

CBP's basis for not promoting her was a pretext for discrimination, based on

either sex, age and/or discrimination. CBP put forth evidence to show that the

two candidates selected for the position were more qualified than Plaintiff.   It is

Plaintiff's burden to present evidence to show that she was more, or as, qualified

than the two candidates selected, and that the real reason she was not promoted

was because she was a disabled female over the age of forty. The Court finds that

Plaintiff has failed to meet this burden.

Accordingly, Plaintiff's claims of disparate treatment based on the sex

discrimination claims are without merit and CBP is entitled to summary

judgment.

## D.    Retaliation

To establish a prima facie case of retaliation, Plaintiff must show: she

engaged in statutorily protected conduct; a reasonable person would have

perceived the alleged retaliatory action to be materially adverse; and a causal

connection exists between participation in the protected activity and the adverse

employment action.  Sutherland v. Mo. Dep't of Corr., 580 F.3d 748, 752 (8th Cir.

2009).  If Plaintiff establishes a prima facie case of retaliation, the burden then

shifts to CBP to produce a legitimate, non-retaliatory reason for its employment

actions.  If CBP meets its burden, then Plaintiff must prove that CBP's reasons are

a pretext for discrimination.  Clegg v. Arkansas Dep't of Corr., 496 F.3d 922, 928

(8th Cir. 2007) (noting that the McDonnell Douglas framework was to be used to

analyze the plaintiff's retaliation claim).

To prove pretext, Plaintiff must both discredit CBP's asserted reasons for

its employment actions and show the circumstances permit drawing a reasonable

inference that the real reason for the employment decision was retaliation.

Gilbert v. Des Moines Area Comm. Coll., 495 F.3d 906, 918 (8th Cir. 2007).  There

is no dispute that Plaintiff engaged in protected conduct when she filed her EEO

complaint.

CBP asserts that to the extent Plaintiff claims that she was subjected to

retaliation, she has failed to demonstrate a prima facie case.  Employment actions

such as commencing performance evaluations, sending critical letters that

threatened discipline, falsely reporting poor performance and failing to mentor

and supervise employees do not necessarily establish a prima facie claim of

retaliation absent a materially adverse consequence to the employee.  See

AuBuchon v. Geithner, 743 F.3d 638, 644 (8th Cir. 2014).

As discussed above, many of the alleged adverse actions are not actionable,

such as Plaintiff being subjected to constant monitoring, the removal of the

printer from her cubicle and her requests for reassignment.  Even if they were

actionable, many of them are untimely, as she did not exhaust her administrative

remedies as to such claims.

CBP further argues Plaintiff cannot show causation between any alleged

adverse action and her protected activity.  She has proffered no evidence that her

EEO activity motivated CBP's employment decisions.  Any temporal chain

between her protected activity and her ultimate departure is broken by her

intervening health issues.  Finally, CBP asserts that Plaintiff has failed to show

pretext.

In her brief in opposition to CBP's motion for summary judgment, Plaintiff

did not address a claim for retaliation.  Instead, under the heading for a hostile

environment claim, Plaintiff argues that ending with the EPP and the proposal to

dismiss her employment, all the events of which Plaintiff complained in her EEO

complaints constitute a hostile environment.  She further argues that "revenge is

a dish best served cold" and proceeds to cite a number of cases that have

recognized a retaliation claim where a great amount of time passed between an

adverse action and protected conduct.  See e.g., Veprinsky v. Fluor Daniel, Inc.,

87 F.3d 881, 891 n. 6 (7th Cir. 1996) (recognizing that "[i]f the plaintiff has

evidence from which one may reasonably infer that her former employer waited in the weeds for five or ten years and then retaliated against her for filing an EEOC charge, we see no difficulty with allowing the case to go forward.  If, on the other hand, the plaintiff has no proof of a nexus between her protected activity and the employer's purported act of belated retaliation, we are confident that her case will be disposed of in short order. This key element of the prima facie case remains an adequate safeguard against meritless claims that significantly post-date the plaintiff's employment.")

Whether Plaintiff is asserting a hostile environment claim or a retaliation claim, the Court finds that Plaintiff has failed to demonstrate that fact questions preclude summary judgment on either claim.

With respect to a hostile environment claim, Plaintiff must prove that 1) she was a member of a protected group; 2) she was subject to unwelcome harassment; 3) the harassment was based on her membership in a protected group; 4) the harassment affected a term, condition or privilege of employment; and 5) that CBP knew or should have known of the harassment and failed to take prompt and remedial action.  See Sutherland v. Missouri Dep't of Corr., 580 F.3d 748, 751 (8th Cir. 2009); Palesch v. Missouri Comm'n on Human Rights, 233 F.3d

560, 566 (8th Cir. 2000).  "Hostile work environment harassment occurs when 'the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Palesch</u>, 233 F.3d at 566 (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)).  The Court must keep in mind that "[n]ot all unpleasant conduct creates a hostile work environment."  <u>Id.</u> (quoting <u>Williams v. City of Kansas City, Missouri</u>, 223 F.3d 749, 753 (8th Cir. 2000)).  Rather, the plaintiff must show that she was singled out because of her sex, age or disability, and that she was subjected to discriminatory conduct that was severe and pervasive.  <u>Id.</u>

Here, Plaintiff does not identify whether the hostile environment was based on her sex, age or disability.  Further, she has not demonstrated that she was subjected to a workplace that was permeated with discriminatory intimidation, ridicule and insult based on her age, sex or disability that is sufficiently severe and pervasive to alter the conditions of her employment. Instead, the record demonstrates that Plaintiff's supervisors did not believe that Plaintiff was completing her job duties in a satisfactory manner, and as a result, she was monitored and subjected to an EPP in order for her to improve her

31

performance.

To the extent Plaintiff is claiming that she was retaliated against because she engaged in protected activity, the Court finds that Plaintiff has failed to show a causal connection between protected activity and an adverse employment action.  Plaintiff was not terminated from her position.  Rather, she no longer works for CBP because her application for disability retirement was granted.

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [Doc. No. 30] is GRANTED.  This matter is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  March 17, 2016

s/ Michael J. Davis
Michael J. Davis
United States District Court

Civil No. 12-2800